IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CATHERINE M. POLLOCK, as Personal
Representative of the Estate of DOUGLAS
EUGENE POLLOCK, CATHERINE M.
POLLOCK, and DOUGLAS K. POLLOCK,

CV. 06-845-AC

                  Plaintiffs,

FINDINGS AND
RECOMMENDATION

      v.

THE CITY OF ASTORIA, a municipal
corporation, DAVE LOGSDON, and PAUL
GILLUM, and other JOHN & JANE DOE'S,

                  Defendants.

_____

ACOSTA, Magistrate Judge:

      Plaintiffs in this case are the surviving parents of Douglas E. Pollock ("the decedent"), whose

death occurred during a confrontation with two police officers in Astoria, Oregon, on June 16, 2004.

Plaintiffs assert that the officers involved in the incident used unreasonable and excessive force while attempting to subdue their son when he physically attacked them in the family's home. Plaintiffs have alleged two claims arising under 42 U.S.C. § 1983: a Fourth Amendment excessive force claim and a Fourteenth Amendment claim for loss of society and companionship against both the City of Astoria and the individual police officers involved. Plaintiffs also had asserted two other claims against the officers individually, for assault/battery and negligence, which the court previously dismissed.

Defendants moved for summary judgment on all claims. For the reasons set out below, Defendants' motion should be granted in its entirety.

### Procedural Background

According to Local Rule 7.1(e)(1), "[a] party must file and serve any response within eleven (11) days after service of the motion." *U.S. District Court, District of Oregon, Local Rules of Civil Practice*. Therefore, the deadline for Plaintiffs' response was January 13, 2008. Plaintiffs failed to file a response before this deadline, and on January 29, 2008, moved for an extension of time in which to file materials in opposition. This motion was denied on January 31, 2008.

### Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

Where the nonmoving party does not file materials in opposition, the court must still evaluate

the legal sufficiency of the motion. *In re Rogstad*, 126 F.3d 1224, 1227 (9th Cir. 1997) ("We have repeatedly held that it is error to grant a motion for summary judgment simply because the opponent failed to oppose."). The moving party must demonstrate its entitlement to summary judgment while "[t]he party opposing the motion is under no obligation to offer affidavits of any other materials in support of its opposition." *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 949 (9th Cir. 1993). In accordance with this obligation, this court must independently review Defendants' materials to determine whether summary judgment is appropriate in this case.

*Factual Background*

Officer Dave Logsdon ("Officer Logsdon") and Officer Paul Gillum ("Officer Gillum") (together "Defendant Officers") are police officers employed by the City of Astoria Police Department ("Astoria Police Department"). At the time of the incident in question, Officers Logsdon and Gillum had been police officers for approximately twenty-two years and twenty-five years respectively. (Defendants' ("Defs.'") Concise Statement of Material Facts ("CSMF") at ¶1.) Defendant Officers were initially trained at the police academy and in the field. Officer Logsdon was promoted to sergeant in 1989, received his advanced certification in 1995, and received training in negotiating in critical situations, tactical supervision, and in critical incidents. *Id.* at ¶ 3. Officer Gillum received his advanced certification in 1994, and had received confrontation simulation training. *Id.* at ¶ 4.

Defendant Officers had each satisfied their firearms training requirements, were certified in the use of a taser, and "had training on the legal limitations on the use of force, including the use of deadly force." *Id.* at ¶ 5. Both Defendant Officers "had participated in 'shoot/don't shoot' training exercises and simulations" involving video simulation and role playing between officers. *Id.* at ¶

39. They had also been trained in "threat assessment," the process of evaluating and responding to situations in the most reasonable and appropriate manner possible. *Id.* ¶ 41. During their law enforcement careers, both officers had received training and gained experience in dealing with persons having physical, emotional, and psychological impairments, including impairments resulting from drugs, alcohol, and stress. *Id*. at ¶ 6.

The incident in question occurred on June 16, 2004, when Officer Gillum "responded to a dispatch that someone had cut the Pacific Power line to a duplex at 218 Franklin in Astoria." *Id.* at ¶ 9. When he arrived, Officer Gillum observed that the power line was indeed down and a witness reported seeing a "big guy" climbing down from the roof. The man was identified as "Doug" by a resident of the duplex. *Id.* Officer Gillum determined that the suspect in question was the decedent, who, at the time of the events at issue, was six feet, three inches in height and weighed between 260 and 300 pounds. (Logsdon Declaration ("Decl.") ¶13.) Officer Gillum knew of the decedent and that he had some mental issues, but the police had been able to safely interact with him on prior occasions. (Defs.' CSMF ¶11.) The decedent's mother, a plaintiff in this case, was present, and she told Officer Gillum that the decedent was inside the house "knocking stuff around" and that he had recently walked out of the hospital, and she characterized him to the officers as "nutso." *Id.* at ¶10.

At this point, Officer Gillum spoke with Officer Logsdon over the radio and requested the assistance of another officer, preferably someone with a taser. Sergeant Logsdon reported that he was en route. *Id*. at ¶11. A taser fires two probes that attach to the target to create a circuit through which electricity is conducted, and both probes must attach for the taser to be effective. *Id.* at ¶16. Officer Gillum removed from the trunk of his police car a beanbag shotgun, a non-lethal weapon that "is designed to deliver non-penetrating contact energy from a safer distance than a police baton and

is intended to produce pain and induce compliance from uncooperative and aggressive suspects." *Id.* at ¶17. The officers decided to have these two weapons available when they contacted Plaintiff. Officer Gillum loaded the beanbag shotgun while Officer Christopher McNeary ("Officer McNeary"), another officer on the scene, "confirmed, in accordance with standard protocol, that it was being loaded with beanbag rounds and not live ammunition." *Id.* at ¶14. The Astoria Police Department "considers the taser and beanbag shotgun forms of non-lethal physical control." *Id.* at ¶16.

The decedent's mother directed Defendant Officers to an open and unlocked entryway to the duplex. Defendant Officers called out "police" and stepped into a utility room which in turn opened into a hallway. *Id.* at ¶19. The decedent then appeared at the end of a hallway and, upon seeing him, Officer Gillum said "Doug, come on down here, I need to talk to you," and Officer Logsdon said "What is going on, Doug?", or words to that effect. *Id.* at ¶19-20. The decedent did not respond verbally but instead turned back into another room, whereupon the Defendant Officers heard a door slam. Both officers believed that the decedent was leaving the premises, and Officer Logsdon radioed Officer McNeary to that effect. *Id.* at ¶21.

As the Defendant Officers began to move back toward the door through which they had entered the house, the decedent reappeared at the end of the hallway "charging Logsdon so fast he bounced off the wall." *Id.* at ¶22. The decedent held "a baseball bat in a two-fisted grip over his head," and proceeded to run at Officer Logsdon. *Id.* Officer Logsdon yelled at the decedent to stop, but the decedent continued to charge Officer Logsdon, swinging the bat in the direction of the officer's head. Officer Logsdon managed to partially evade the decedent's initial attempt to club him with the bat, taking the blow on the right shoulder. Officer Logsdon fired his taser at the

decedent, but the device produced no visible effect on him. *Id.* at ¶23. Officer Gillum attempted

to slow the decedent by firing beanbag rounds at him, which also had no effect. *Id.* at ¶27.

At this point, Officer Logsdon fired his service pistol as he attempted to back away from the

decedent, who still was wielding the bat. *Id.* at ¶26. Officer Logsdon tripped and fell to the floor,

and the decedent then was physically on top of him. *Id.* at ¶28. Officer Logsdon again fired his

service pistol at the decedent, the final of several shots causing the decedent to fall backward and

drop the bat. *Id.* The Defendant Officers estimated that approximately 20 to 30 seconds elapsed

between the time they first entered the house and the end of their confrontation with the decedent.

*Id.* at ¶31.

Officer McNeary heard the disturbance and came running, weapon drawn and calling for

medical personnel. *Id.* at ¶30. While awaiting the arrival of medical personnel, Officer McNeary

"attempted to provide medical attention" to the decedent. *Id.* at ¶34. Officer McNeary's efforts

were unsuccessful and the decedent died some time later. Officer Logsdon was treated for his

injuries at Columbia Memorial Hospital. *Id.* at ¶35.

The incident and resulting death were independently investigated by a group consisting of

the Clatsop County Sheriff's Office, Oregon State Police, Cannon Beach Police Department, Seaside

Police Department, and Dr. Stefanelli, District Medical Examiner. This investigation was reviewed

by the Clatsop County District Attorney. *Id.* at ¶44. The incident was also internally reviewed by

the Firearms Incident Review Board that "unanimously concluded that the use of deadly force," as

well as the discharge of less lethal weapons were "justified under Department policy." *Id.* at ¶45.

The Astoria Police Department's policy on the use of force was established at the time of

these events. *Id.* at ¶38. Officers are allowed to use only that amount of force that appears

reasonably necessary to effectively control an incident, given the facts and circumstances perceived by the officer at the time of the incident. *Id.* at ¶42. Department policy authorizes the use of deadly force only when the officer believes it is necessary "to protect the officer or any other person from the use or threatened imminent use of deadly physical force"; or "to protect the officer or any other person from death or serious physical injury"; or to prevent the escape of a suspect in a felony where the officer believes the escape will result in an "imminent threat to human life." *Id.* at ¶ 43. Department policies also prohibited officers from violating local, state, or federal criminal or civil codes and ordinances, and from failing to protect a citizen's civil rights when the need to do so was known to or reasonably should have been known to a competent officer; and required them to observe, respect, and protect the constitutional rights of every person with whom they have contact. (Deu Pree Decl. ¶¶ 6, 7.)

*Discussion*

1. <u>Defendant Officers' Procedural Standing</u>

As a preliminary matter, the court will consider whether Plaintiffs sued Defendant Officers in their personal or official capacities. Plaintiffs assert two claims against Defendant Officers as "individual defendants": excessive force and loss of society and companionship. (Complaint 5.) Both claims arise under § 1983. Defendants assert that Plaintiffs' § 1983 claims against Defendant Officers are alleged in their official capacity, rather than their personal capacity. This, Defendants argue, means that these claims are identical to the claims lodged against the municipality itself. The court agrees that, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citing *Brandon v. Holt*, 469 U.S. 464, 471-

472 (1985)). However, the court does not agree that the Plaintiffs' § 1983 claims against Defendant

Officers were made in their official capacity and instead construes them as personal capacity claims.

For the proposition that a claim silent as to capacity should be construed as an official

capacity claim, Defendants cite out-of-circuit precedent contrary to clearly established Ninth Circuit

precedent. "In the Ninth Circuit, it is well established that when a complaint in a § 1983 action

seeking damages against a state official is silent as to capacity, it is presumed that the plaintiff is

suing the official in his or her personal capacity, so that the Eleventh Amendment does not bar the

action." *Bennett v. Misner*, 2004 U.S. Dist. LEXIS 19568, *28 (D. Or. Sept. 17, 2004). *See Romano

v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999) ("We also have presumed that officials necessarily are

sued in their personal capacities where those officials are named in a complaint, even if the

complaint does not explicitly mention the capacity in which they are sued.").

This presumption, that § 1983 claims against individuals are personal capacity claims, has

been observed in this district even where the "complaint expressly uses the language 'official

capacity.'" *Lumbreras v. Roberts*, 319 F. Supp. 2d 1191, 1203 (D. Or., 2004). In *Lumbreras*, the

court treated the matter as a personal capacity suit because the plaintiffs' alleged "loss caused by

defendants' individual conduct and [sought] money damages. The complaint's use of official

capacity language [was] best viewed as an attempt merely to emphasize that the defendants were

acting under color of law." *Id.* (internal quotation marks omitted).

Here, the complaint does not expressly allege in which capacity Plaintiffs intend to sue

Defendant Officers, but its construction gives the court no reason to depart from this circuit's

controlling presumption in favor of personal capacity § 1983 claims. First, Plaintiffs separate their

claims against the City of Astoria and Defendant Officers into two discrete sections: "CLAIMS

AGAINST THE CITY OF ASTORIA" and "CLAIMS AGAINST INDIVIDUAL DEFENDANTS." (Compl. 4-5.) Construing Plaintiffs' claims against Defendant Officers as official capacity claims would render this intentional division superfluous. It would also render the claims themselves, as recited in the complaint, otherwise superfluous.

Second, Plaintiffs name Defendant Officers personally in the complaint and seek money damages. (Compl. 1,7.) This also signals that Defendant Officers are sued in their personal capacities. *See Lumbreras*, 319 F. Supp. 2d at 1203 ("Any other construction would be illogical where the complaint is silent as to capacity, since a claim for damages against state officials in their official capacities is plainly barred." (*citing Shoshone-Bannock Tribes v. Fish & Game Com'n, Idaho*, 42 F.3d 1278, 1284 (9th Cir. 1994)). Although a municipality might still be sued for damages under, for example, the *Monell* framework, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the official entity is immune from respondeat superior liability under §1983. *See Collins v. City of Harker Heights*, 503 U.S. 115, 123 (1992) ("*Respondeat superior* or vicarious liability will not attach under §1983." (emphasis in original)).

Third, the complaint does not explicitly allege that the claims against Defendant Officers are made in their official capacity. This activates the presumption that Plaintiffs' claims against Defendant Officers are personal capacity claims: "when officials are named personally in a complaint and the plaintiff seeks money damages, the court must presume that the plaintiff asserts a personal-capacity suit." *Lumbreras*, 319 F. Supp. 2d at 1203. Therefore, Plaintiffs' claims against Defendant Officers are made in their personal capacity and not barred by the Eleventh Amendment prohibition against official capacity suits. *See Romano*, 169 F.3d at 1185 ("The amendment prohibits actions for damages against an 'official's office,' that is, actions that are in reality suits

against the state itself." (quoting *Stivers v. Pierce*, 71 F.3d 732, 749 (9th Cir. 1995)).  Therefore, the court will analyze these claims in conjunction with, but separate from, Plaintiffs' claims against the City of Astoria.

2. Excessive Force – Fourth Amendment Violation

According to the Supreme Court, "[42 U.S.C.] § 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.  In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) (internal quotation marks omitted)).  Here, Plaintiffs assert, on behalf of the decedent, that Defendants violated his right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment.  Defendant Officers allegedly violated this right through an application of excessive force.

Excessive force claims "are analyzed under the objective reasonableness standard of the Fourth Amendment." *Blanford v. Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).  "An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).  Reasonableness is judged by an objective standard, "without regard to [the officers'] underlying intent or motivation" and should reflect a balance between "the nature and quality of the intrusion on the individual's Fourth Amendment interests [and] the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396-397.  Additional factors that bear on reasonableness include "the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. In addition, "[o]fficers . . . need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Scott*, 39 F.3d at 915.

In the present case, reasonable minds could not differ that Defendant Officers' actions satisfy the reasonableness standard. They arrived on the scene in response to a report that someone had cut a live power line to a residence. Officer Gillum had some prior interactions with the decedent which did not involve violent behavior, but on this occasion the decedent had been reported to have intentionally cut power lines, a felony offense, and was agitated to the point that his mother described his state to Defendant Officers as "nutso." Despite these reports of the decedent's agitated state, Defendant Officers did not choose to enter the house with their service firearms drawn and ready. Instead, each officer equipped himself with non-lethal tools before they entered the house to make contact with the decedent.

The Defendant Officers' entry into the house was cautious. After looking through the unlocked door to which the decedent's mother had directed them, they announced their presence and stepped through the door and into the house, stopping after they entered. Officer Logsdon carried his taser but had concealed it and his service pistol behind his body so that the decedent could not see them, a technique likely intended to reduce the risk of alarming or further agitating the decedent. When the decedent appeared at the other end of the hallway, they engaged him verbally, asking him to come to them to talk. The decedent disappeared and then reappeared, and immediately began to run at Officer Logsdon with a baseball bat held over his head. Defendant Officers first responded

by ordering the decedent to stop, then, even though he did not stop and began swinging the bat at Officer Logsdon's head, they used their non-lethal tools to try to stop the decedent. Only when neither the taser nor the beanbag shotgun rounds had any effect on the decedent did Officer Logsdon, whom the decedent was attacking with the bat, use lethal force to repel the decedent's attack. That Officer Logsdon's taser failed to fully engage the decedent does not affect the determination that the Defendant Officers acted reasonably; in the context of the confrontation and the brief time period in which it occurred, Officer Logsdon reasonably perceived that the taser had been ineffective in stopping a person of the decedent's size and manifest aggression, and the officer could not have been reasonably expected to attempt to retrieve and reset the taser's electric probe in the face of the decedent's continuing violent attack on him.

Under Oregon law, a "peace officer" is justified in the use of deadly force where it is "necessary to defend the peace officer or another person from the use or threatened imminent use of deadly physical force; or . . . [t]he officer's life or personal safety is endangered in the particular circumstances involved." ORS § 161.239(c),(e). Under the circumstances described above, reasonable minds could not differ that Officer Logsdon had probable cause to believe that the decedent posed a significant threat of death of serious physical injury to himself and others. Defendant Officers' use of force was not unreasonable and, therefore, not excessive, and there was no violation of the decedent's Fourth Amendment rights and Defendants' motion for summary judgment on the excessive force claim should be granted.

3. Fourteenth Amendment:  Excessive Force – § 1983

It is well settled that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987). However,

the Ninth Circuit has held that "parents can challenge under section 1983 a state's severance of a parent-child relationship as interfering with their liberty interest in the companionship and society of their children." *Id*. Such an action arises from the substantive due process protections of the Fourteenth Amendment and "[is] permitted under § 1983 if authorized by the applicable state law." *Byrd v. Guess*, 137 F.3d 1126, 1131 (9th Cir. 1998). In other words, applicable state law must include a "survival action as a suitable remedy . . . not inconsistent with the Constitution and the laws of the United States . . . ." *Smith*, 818 F.2d at 1416 (quoting 42 U.S.C. § 1983).

In Oregon, survival actions are governed by ORS § 115.305 which states: "[a]ll causes of action or suit, by one person against another, survive to the personal representative of the former and against the personal representative of the latter." *See also* ORS § 30.075 ("Causes of action arising out of injuries to a person, caused by the wrongful act or omission of another, shall not abate upon the death of the injured person, and the personal representative may maintain an action against the wrongdoer."). Therefore, Plaintiffs may assert a substantive due process violation of § 1983, arising from their loss of the society and companionship of the decedent.

However, to prevail on a Fourteenth Amendment claim for loss of consortium, more than negligently inflicted harm must be shown. A plaintiff "must prove that the [o]fficers acted with deliberate indifference to the [plaintiff's] rights of familial relationship and society by using excessive force against [decedent]." *Byrd*, 137 F.3d at 1134. The Supreme Court has further distinguished the "deliberate indifference" standard in the context of exigent circumstances, such as a prison riot or high speed police chase, from the standard applied when the state actor actually has an opportunity to deliberate. It explained that, as with

> officer liability in a prison riot[,] . . . the police on an occasion calling for fast action
> have obligations that tend to tug against each other. Their duty is to restore and

> maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance.

*County of Sacramento v. Lewis*, 523 U.S. 833, 852-853 (1998) (internal quotation marks omitted). Therefore, the Court held, "a much higher standard of fault than deliberate indifference has to be shown for officer liability" in those types of rapidly developing situations. *Id.*

Further, "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 847. Accordingly, "when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates 'the large concerns of the governors and the governed.'" *Id*. at 853 (citing *Daniels v. Williams*, 474 U.S. 327, 332 (1986)).

In *Lewis*, the decedent was a passenger on a motorcycle driven at high speed past a parked police cruiser. The motorcycle's driver ignored the police officer's signal to pull over and a high-speed chase through a residential area ensued. When the motorcycle crashed, the police cruiser was unable to stop in time and hit the motorcycle's passenger, killing him. The court held that there was no Fourteenth Amendment violation, explaining that "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking the conscience, necessary for a due process violation." 523 U.S. at 836.

The evidence here does not support a genuine issue of material fact that the Defendant Officers acted with the deliberate indifference that the Supreme Court has held will support a Fourteenth Amendment claim for excessive force. The confrontation between Defendant Officers and the decedent emerged suddenly and developed rapidly, thus requiring Defendant Officers to

think and act quickly.  Defendant Officers attempted to avoid possible serious harm to the decedent by equipping themselves with non-lethal weapons.  They purposefully approached the defendant in a manner calculated to minimize alarming him and avoid causing him to feel threatened.  After the decedent began his attack upon Officer Logsdon with the baseball bat, the Defendant Officers still refrained from using lethal force and instead, consistent with their training, employed the non-lethal tools which they had readied in case of just such a situation.  Only when the decedent's assault could not be stopped by use of these non-lethal devices did Officer Logsdon employ deadly force to protect himself from the decedent's sustained close-quarters attack.    In sum, the circumstances demonstrate neither a "deliberate indifference" to Plaintiffs' rights, nor "a purpose to cause harm unrelated" to the arrest, as those standards have been explained and applied by the Supreme Court and other courts.  Therefore, Defendants' motion for summary judgment on Plaintiffs' Fourteenth Amendment claim should be granted.

### 4.  Qualified Immunity

"[G]overnment officials performing discretionary functions [are entitled to] qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought to be consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638 (1987) (citations omitted).  This "immunity is an entitlement not to stand trial or face the other burdens of litigation," and extends beyond a "mere defense to liability," as its benefit is "effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) (*citing Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (internal quotation marks omitted)).  Even so, qualified immunity is an affirmative defense to an action for damages; it does not bar actions for declaratory or injunctive relief. *American Fire, Theft &*

*Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court clarified the analytical framework to be applied to qualified immunity claims. First, a court evaluating qualified immunity must address "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Id.*

However, if a constitutional violation may have occurred, "the next, sequential step is to ask whether the right was clearly established." *Id.* A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* This determination should be based on the specific circumstances presented, rather than general principles. "If the law did not put the official on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202. It follows that, "in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable." *Id.* at 206.

Certain fundamental rules apply to the use of deadly force and guide this analysis. Generally, "[l]aw enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). In *Figueroa v. Gates*, 207 F. Supp. 2d 1085 (C.D. Cal. 2002), the district court closely examined the application of the qualified immunity defense in excessive force cases and, in doing so, summarized recent developments in this area of the law. First, "[c]ourts have repeatedly held that excessive force

defendants are not entitled to qualified immunity in cases where decedents did not have weapons on their persons, brandish weapons, or threaten to use them--even if the officers believed the decedents were armed." *Id.* at 1093. Second, typically, "defendants are not entitled to qualified immunity where the decedent is in retreat or has made no attempt to flee." *Id.* at 1093. Overall, "the primary focus of [the] inquiry . . . remains on whether the officer was in danger at the exact moment of the threat of force." *Id.* (*quoting Medina v. Cram*, 252 F.3d 1124, 1132 (11th Cir. 2002) (where officers, who used deadly force when decedent continued to approach despite the officers' use of non-deadly force, were entitled to qualified immunity)).

Here, reasonable minds could not differ that Defendant Officers' actions were consistent with the decedent's rights and that the decedent presented an immediate threat of serious injury or death. The decedent had a weapon, brandished the weapon, and repeatedly attempted to use the weapon against Officer Logsdon. The decedent neither attempted to retreat, nor was in retreat. Rather, he ran at Officer Logsdon while brandishing the baseball bat as a weapon, an objective manifestation of intent to inflict severe injuries or death, and non-lethal tools failed to stop or blunt his attack. There is no question that a reasonable officer in Officer Logsdon's circumstances would have perceived himself in danger at the moment he used deadly force against decedent. For these reasons, Defendant Officers are entitled to qualified immunity and their motion for summary judgment should be granted.

## 5. *Monell* Liability

A municipality may be liable under § 1983, where its conduct resulted in a violation of a plaintiff's constitutional rights. *See Monell*, 436 U.S. at 690 ("Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the

action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."). Although a municipality is exposed to liability under § 1983, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

The Supreme Court held that "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Put more simply, where there is no underlying constitutional violation, there can be no municipal liability under § 1983. Because, here, the court has found no constitutional violation by the Defendant Officers, the City of Astoria should not be held liable for violations under § 1983 and summary judgment should be granted on those claims.

However, even if the Defendant Officers were found to have violated the decedent's constitutional rights, the City of Astoria still would not incur *Monell* liability. Municipalities are not liable every time an employee commits a tortious act, because they are not subject to respondeat superior liability. *See Bryan County*, 520 U.S. at 403 ("We have consistently refused to hold municipalities liable under a theory of respondeat superior."). Instead, "a city can be liable under § 1983 for inadequate training of its employees." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). As the Supreme Court held in *Canton*, the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the

rights of persons with whom the police come into contact." *Id. Canton* sets forth a three-part test to establish when inadequacy of training amounts to a violation under § 1983. "First, it must be determined whether the existing training program is adequate . . . . A training program will be deemed adequate if it 'enables officers to respond properly to the usual and recurring situations with which they must deal.'" *Merritt v. County of Los Angeles*, 875 F. 2d 765, 770 (9th Cir. 1989) (quoting *Canton*, 489 U.S. at 391). Where the existing program is adequate, there is no need for further inquiry.

If, however, the existing program is deemed inadequate, the court must next determine if the training program "may justifiably be said to constitute a city policy. Such will be the case only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* (quoting *Canton,* 489 U.S. at 388) (internal quotation marks omitted). Finally, the inadequate training "must be shown to have 'actually caused' the constitutional deprivation at issue." *Id.* (quoting *Canton,* 489 U.S. at 391).

In this case, the *Monell* inquiry ends at step one. The record establishes that the existing training program met *Monell's* constitutional requirements, as it shows a long-established, well-integrated training program in place at the time of the events at issue. And, even assuming that the City of Astoria's training program could be viewed as giving rise to this particular incident, "[a] plaintiff cannot prove the existence of a *municipal* policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989). According to Officer Logsdon, "[t]his was the only officer-involved shooting in the Astoria Police Department since 1982 . . . ." (Logsdon Decl. 5.) There is no evidence from which a reasonable fact finder could conclude that the existing

training program is inadequate.

In sum, the court finds no underlying constitutional violation to justify liability for the City of Astoria under § 1983.

## **CONCLUSION**

For the reasons stated, Defendants motion for summary judgment should be GRANTED on all claims.

## **SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than May 6, 2008. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, any party may file a response within fourteen days after the date the objections are filed. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

DATED this 21st day of April, 2008.


        _____/s/ John V. Acosta_____
                JOHN V. ACOSTA
            United States Magistrate Judge